A02A0903. ACREE et al. v. McMAHAN.
(574 SE2d 567)

SMITH, Presiding Judge.

Dr. Howard McMahan brought suit against Dr. Russell Acree and Memorial Health Services, Inc. to recover damages for breach of contract. A jury trial resulted in a verdict for McMahan, and the two defendants appeal. They raise issues regarding the propriety of applying the doctrine of piercing the corporate veil and allege several errors regarding proof of and interpretation of the contract in issue. We find no error and affirm.

The evidence presented at trial showed that Acree formed Memorial Health Services, Inc. (MHS), a corporation in which he was the principal shareholder, to manage and sometimes purchase various small hospitals in South Georgia. In 1984, McMahan began practicing medicine in a group in Adel with Acree. When MHS acquired management rights to a hospital in Hahira, Acree and McMahan recruited Dr. Gene Jackson, an old friend of McMahan, to relocate his practice to Hahira. In the fall of 1990, Acree approached McMahan with a proposal to relocate to Ocilla, in Irwin County, where Acree was in the process of finalizing an agreement for MHS to manage the hospital. Although McMahan was not at first receptive, he eventually agreed. He, Acree, and Jackson formed a corporation, AJM, Inc., to formalize the structure of their practice, management, and potential ownership agreement with regard to the Ocilla relocation. Under the agreement, he and Jackson were to relocate to Ocilla and practice there. They agreed to be on the hospital staff and assist in turning around the hospital's finances by admitting patients and using the hospital facilities. Eventually they were to become part of the management team. The management agreement MHS had with the hospital included a purchase option, and under the AJM agreement, if the hospital were sold, McMahan and Jackson would be offered an equity position in the hospital.

In November 1990, after the AJM agreement was executed, McMahan and Jackson relocated their medical practices to Ocilla. McMahan's family followed in early 1991. In essence, MHS assigned its management contract with the hospital in Ocilla to AJM, with Acree providing the expertise acquired through previous experience, and McMahan and Jackson providing the manpower for daily operations. As time went on, however, it became apparent that differences of opinion, both philosophical and practical, existed between McMahan and Jackson, on the one hand, and Acree on the other hand. Because of these differences, in May 1992 the principals in AJM reached a buyout agreement, whereby Acree would purchase the shares in AJM of both McMahan and Jackson.

Under this agreement, Acree agreed to pay the other two doctors

$750,000 each for their shares, in certain prescribed payments. Acree also agreed to maintain the hospital as an acute care facility, improve its physical plant and equipment as the budget permitted, maintain the hospital staff, assist in recruitment efforts, and promote the hospital. For their parts, McMahan and Jackson agreed to maintain their practice in Ocilla, continue to use the hospital as their primary inpatient facility, keep up their committee work, and cover the emergency room and the nursing home 24 hours a day. They also agreed to try to recruit two additional doctors, maintain their relationship with the community, and promote the hospital.

The first payment required under the agreement was for $150,000 each to McMahan and Jackson. This was made on time, by MHS. In June 1992, monthly payments of $5,000 began to McMahan and Jackson. These checks were drawn on the account of Irwin County Hospital. In August 1993, after disagreements with Acree over another doctor recruited by Acree, updating hospital equipment, and Acree's announcement that he would open a practice in Ocilla, Jackson decided to leave and announced his departure.

After Jackson left, McMahan continued active participation in emergency room call and admitted patients to the hospital. His monthly checks were sometimes delayed. In January 1994, when McMahan had not received his check by mid-month he telephoned Acree, who informed him that he was unhappy with McMahan's performance regarding the number of patients he was admitting to the hospital and would no longer pay him under the buyout agreement. McMahan then told Acree that he could not accept an agreement that made compensation contingent upon the number of patients he admitted, and he would no longer actively cover the emergency room until their impasse regarding the terms of the agreement was settled. No further payments were made under the agreement. McMahan then wrote to the acting hospital administrator requesting a change in his staff privileges from active staff to courtesy staff, which would allow him to admit his patients to the hospital and take care of his patients in the nursing home, but relieved him from emergency room duties. This change in privileges was accepted. MHS's management contract and option to purchase were later sold, and McMahan resumed his active staff privileges thereafter.

1. In one enumeration, Acree and MHS contend the trial court erred in giving McMahan's requested charges 1, 3, and 6, dealing with part performance and piercing the corporate veil. They maintain that these charges should not have been given because they misstated the law and were not adjusted to the evidence presented, and because under Georgia law, the doctrines of "alter ego" and "piercing the corporate veil" may not be applied in reverse. We do not agree.

The trial court charged as follows:

Now, the law is founded on the legal principle that a corporation is a separate entity, distinct and apart from its stockholders. Performance by one party to a contract and acceptance by the other would establish an enforceable contract, even though not in writing. Although a corporation possesses a legal existence separate and apart from that of his [sic] officers and stockholders, this separate entity can be disregarded when the corporation has overextended its privileges. The plaintiff contends that the separate personalities of the defendant, Memorial Health Services and Russell Acree, no longer exist. To establish this the plaintiff must prove by a preponderance of the evidence that the defendant, Russell Acree, disregard[ed] the corporate entity, made it a mere . . . instrumentality for the transaction of his own affairs that there was such a unity of interest in ownership that the separate personalities of Memorial Health Services and Russell Acree no longer exist and to adhere to the doctrine of corporate entity would promote injustice or protect fraud.

(a) Acree and MHS argue that the charges should not have been given because no evidence was presented that Acree abused the corporate form.

The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or to evade contractual or tort responsibility. Because the cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders, the mere operation of corporate business does not render one personally liable for corporate acts. Sole ownership of a corporation by one person or another corporation is not a factor, and neither is the fact that the sole owner uses and controls it to promote his ends. There must be evidence of abuse of the corporate form. Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control. In deciding this enumeration of error, we are confronted with two maxims that sometimes conflict. On the one hand, we are mindful that great caution should be exercised by the court in disregarding the corporate entity. On the other, it is axiomatic that when litigated, the issue of piercing the cor-

porate veil is for the jury, unless there is no evidence sufficient to justify disregarding the corporate form.

(Citations and punctuation omitted.) *Soerries v. Dancause*, 248 Ga. App. 374, 375 (546 SE2d 356) (2001).

Evidence was presented that Acree signed the agreement to buy out McMahan's (and Jackson's) shares in AJM, Inc. personally. But the initial installment of the agreed-upon purchase price for these shares, in the amount of $150,000, was paid not by Acree, but by MHS, and subsequent monthly payments were paid by Irwin County Hospital. Even though Acree was the sole signatory to the agreement other than McMahan and Jackson, the duties required of McMahan (and Jackson) under the agreement could not have been owed to Acree personally, because Acree personally did not manage the hospital; the duties were owed to MHS. Similarly, Acree could not perform duties he promised to perform under the contract because he, individually, did not have the hospital management contract. Acree agreed to perform services that only MHS could perform; he agreed to accept services from McMahan that only MHS could accept; and MHS actually performed certain obligations that Acree promised. The evidence showed clearly that Acree "disregarded the separateness" of himself and MHS. In doing so, Acree evaded his personal contractual obligation to pay McMahan for his shares of AJM.

(b) Acree and MHS maintain that the charge given, taken substantially from this court's opinion in *Derbyshire v. United Builders Supplies*, 194 Ga. App. 840, 844-845 (2) (392 SE2d 37) (1990), left out essential language and concepts from the original text and misstated the law. They argue that this selective quotation "quite literally butchered" the meaning of the original statement in *Derbyshire*, since the original passage made it clear that to pierce the corporate veil it is necessary to show abuse of the corporate form, which was not shown here. But the trial court's charge instructed the jury that to pierce the corporate veil McMahan must prove that Acree disregarded the corporate entity and "that the separate personalities of Memorial Health Services and Russell Acree no longer exist and to adhere to the doctrine of corporate entity would promote injustice or protect fraud." This covered the point adequately, did not omit essential language, was tailored to the evidence presented, and did not "butcher" the meaning of the principle found in *Derbyshire*. Contrary to appellants' argument, it is not necessary that Acree had actually perpetrated a fraud that harmed McMahan in order to pierce the corporate veil. Here, as in *J & J Materials v. Conyers Seafood Co.*, 214 Ga. App. 63, 65 (446 SE2d 781) (1994), sufficient evidence was presented to raise a jury question as to whether the shareholder so disregarded the corporate form as to make the corporation "a mere

business conduit" for the shareholder personally and authorize a jury to pierce the corporate veil. Id.

(c) Acree and MHS argue that giving the requested charge regarding part performance of an oral contract was unnecessary because it was not adjusted to the evidence. They argue further that giving this charge along with the charge on piercing the corporate veil misled the jury into believing that performance by one party and acceptance by the other "is somehow part of a test for determining corporate existence."

On the contrary, this portion of the charge was vital, since the appellants contended that the written buyout contract contained a provision under which if *either* McMahan *or* Jackson left, the other would not be paid the remainder of the purchase price owed. But even assuming, without deciding, that appellants' interpretation of that portion of the written agreement was correct, evidence was presented regarding the remaining parties' alteration of certain terms of the written contract after Jackson left and their clarification of other terms. McMahan testified that when Jackson left, he met with Acree and they orally agreed that McMahan would continue to be paid under the contract if he performed his duties. Moreover, we do not find that this portion of the charge was confusing or that it could have misled the jury as alleged by Acree and MHS.

(d) Acree and MHS also point out that the concept of piercing the corporate veil or "alter ego" is meant to apply when seeking to pierce a corporation's legal status to reach the assets of its controlling shareholder. They maintain that Georgia law is clear that the concept may not be applied in reverse, as here, to impose contractual liability upon a corporation not a party to the contract in issue, by showing that its principal shareholder had merged his individual identity into that of the corporation. But contrary to the argument of Acree and MHS, we do not find that to be the "clear holding" of *Gwinnett Property, NV v. G+H Montage GmbH*, 215 Ga. App. 889 (453 SE2d 52) (1994).

In *Gwinnett Property*, a "reverse piercing of the corporate veil" theory was advanced, but this court held that the evidence presented in that case was insufficient to invoke the concept because the individual in issue, Irvani, owned no stock in the corporation. Id. at 893. We further conclude that Acree and MHS have misinterpreted our additional statement in *Gwinnett Property* with regard to reversing the concept of piercing the corporate veil. After discussing the insufficiency of the evidence to support applying the concept of piercing the corporate veil, we noted that

G+H has improperly reversed the use of the alter ego doctrine. That doctrine is generally used for the purpose of

> piercing the corporate veil to hold an individual stockholder liable for debts incurred by the corporation. Here, G+H has asserted the alter ego theory, not to reach Irvani by piercing the corporate veil, but to hold GIDS liable for Irvani's personal debt. In asserting its reversed alter ego claim, G+H relies on much of the same evidence it cites in support of its fraudulent conveyances claim. This reliance on the same evidence reveals that G+H has not asserted a proper alter ego claim, but has simply recast its fraudulent conveyances theory under the guise of the alter ego doctrine.

(Citation omitted.) Id. Given the factual background in *Gwinnett Property*, this statement is certainly not a "clear holding" that Georgia law does not permit the concept of piercing the corporate veil to be applied in reverse. It is merely a conclusion that the concept was *improperly* reversed in that particular case. This at least suggests that under different circumstances the concept may be *properly* reversed.

So long as it is properly pierced under applicable law, we see no reason why the corporate "veil" should not be a membrane permeable from either direction, permitting liability to move either into or out of the corporate form, to serve the interests of justice and prevent fraud. A "reverse pierce" was sought in *Hogan v. Mayor &c. of Savannah*, 171 Ga. App. 671 (320 SE2d 555) (1984). We did not pronounce the concept inapplicable in reverse; this court simply considered the concept and declined to apply it, finding that since "there is no evidence of any abuse of corporate form, . . . no issue as to piercing the corporate veil is presented. [Cits.]" Id. at 673 (3).

Here, we have determined that the evidence presented supports piercing the corporate veil. With regard to his transactions with McMahan, Acree's individual identity is so enmeshed in that of MHS that they are interchangeable and virtually indistinguishable. If Acree should be unable to pay a judgment against him because his assets are tied up in MHS, injustice to McMahan certainly would be prevented by allowing recovery from the corporation. The trial court did not err in its charge to the jury.

2. We find no merit in the contention of Acree and MHS that the trial court erred in submitting the breach of contract issue to the jury because McMahan never proved the terms of the contract. The written contract was entered into evidence, and McMahan testified to the oral departures from the original contract necessitated by Jackson's leaving. These departures apparently were agreed to by Acree, as shown by his partial performance. McMahan continued to be paid monthly until January and other doctors were recruited to share in the emergency call rotation, which under the original written con-

tract was the duty of McMahan and Jackson alone. McMahan clearly also continued performing his obligations under the agreement until payment was stopped in January 1994. Acree and MHS's very suggestion that the parol evidence rule bars the introduction of new contract terms shows the necessity for the jury instruction regarding performance by one party.

3. Acree and MHS contend McMahan did not prove that Acree breached the buyout agreement. They argue that under the uncontradicted testimony, the most Acree could have done was commit an anticipatory breach, which theory was expressly disclaimed by McMahan. Although McMahan stated at trial that he was not relying on the theory of anticipatory breach, we do not agree that McMahan failed to prove that Acree breached the contract. Evidence was presented showing the terms of the contract and the parties' understanding of it. The agreement clearly was a buyout agreement, but evidence was presented showing that Acree did not treat it as such. While retaining the benefit of the buyout agreement, sole control of AJM, Acree treated his installment payments due on the purchase price for McMahan's shares more as payments under an employment agreement by conditioning payment on performance terms that were not included in the original writing or agreed to subsequently by McMahan. When McMahan did not agree to these new terms, all payment was stopped. Even in their brief to this court, Acree and MHS insist that the monthly payments under the agreement were "made in exchange for services at the hospital, which included emergency room service, committee functions, and all the other items enumerated in the written agreement." But the jury could have concluded that by instituting new and unacceptable terms, Acree impermissibly changed the terms of the contract and made performance by McMahan of his obligations under the contract impossible.

4. Acree and MHS assert that the contract was unambiguous and that the trial court should have interpreted its clear terms and directed a verdict in favor of them, rather than allowing the jury to interpret the contract. We do not agree.

In this enumeration, Acree and MHS refer to the paragraph in the agreement included under "Exceptions to the Above," which reads as follows:

> During the term of the agreement if Howard C. McMahan or Eugene H. Jackson leave Ocilla and Irwin County, discontinue their medical practice in Ocilla, change the type of practice they now have established, fail to use Irwin County Hospital for their primary patient care facility or compete with the hospital for medical services normally provided by the hospital then all payments to them will cease.

Acree and MHS argue that because of the key words "or" and "them," this provision is unambiguous in providing that should either of the two doctors leave, payments would cease to both doctors, even should the other doctor remain. The provision is by no means devoid of ambiguity. McMahan testified that his understanding was different and that, when asked about this very point, Acree agreed with his interpretation. Acree's payments to McMahan from September to December 1993, after Jackson left, also make clear that his interpretation at that time differed from the interpretation he now presents to this court. The evidence shows that this provision in the contract was ambiguous, even after the application of the rules of construction. The trial court did not err in submitting it to the jury for interpretation.

Moreover, even if the contract were unambiguous, as argued by Acree and MHS, a fair and reasonable construction must be placed upon it. *Smith's Properties v. RTM Enterprises*, 160 Ga. App. 102, 103 (2) (286 SE2d 334) (1981) (physical precedent only but full concurrence as to Division 2). Construing it to end payments to McMahan if Jackson left even if McMahan stayed and fulfilled his obligations is neither fair nor reasonable.

*Judgment affirmed. Eldridge and Ellington, JJ., concur.*

DECIDED NOVEMBER 19, 2002

*Bouhan, Williams & Levy, Walter C. Hartridge, David M. Conner, John G. Odom*, for appellants.

*O. Wayne Ellerbee, Tom W. Thomas*, for appellee.

